IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Special Agent Christine Gass, being duly sworn, hereby depose and state the following:

1.      I am currently employed as a Special Agent for the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and have been so employed since September 2021. I am currently assigned to ATF's Fargo Field Office in ATF's Saint Paul Field Division. I have conducted and participated in investigations concerning the illegal possession of firearms under both the Gun Control Act of 1968 and the National Firearms Act of 1934.

2.      I received training through the ATF Special Agent Basic Training (SABT) at the Federal Law Enforcement Training Center (FLETC). I received training through the Criminal Investigator Training Program (CITP) at FLETC. Prior to this position, I was employed as a Patrol Deputy with the Crow Wing County Sheriff's Office in Brainerd, Minnesota. Prior to that employment, I was employed as a Special Agent with the North Dakota Bureau of Criminal Investigation. As a Patrol Deputy and Special Agent, I have participated in numerous investigations, which resulted in the arrests, searches, seizures, and convictions of individuals.

3.      I am familiar with the facts and circumstances set forth herein as a result of my personal participation in this investigation as well as my review of official reports, records, and conversations with other law enforcement officers and ATF personnel as more fully described below.

4.      This affidavit is submitted for the limited purpose of establishing probable cause in support of a search warrant alleging that Rare Breed Triggers, LLC (RBT), Lawrence DeMonico, Kevin Maxwell, and others, are in violation of:

a. 18 U.S.C. § 922(o), illegal possession of machineguns

b. 26 U.S.C. § 5861(d), unlawful possession of unregistered machineguns

c. 26 U.S.C. § 5861(e), unlawful transfer of unregistered machineguns

Since this Affidavit is for the limited purpose of establishing probable cause to support the search warrant, it contains only a summary of relevant facts. I have not included every fact known to me concerning the entities, individuals, and the events described in this affidavit.

5. The statements made in this Affidavit are based in part on: (a) my personal participation in this investigation; (b) information provided to me by other law enforcement officers and personnel employed by ATF; (c) my review of documents and records in the possession of ATF; and (d) my training and experience. Where the content of documents and the actions and statements of individuals are reported herein, they are reported in substance and part, except where otherwise indicated.

6. Title 28 of the United States Code provides ATF the authority to investigate criminal and regulatory violations of Federal firearms law at the direction of the Attorney General. Under the corresponding Federal regulation at 28 C.F.R. § 0.130, the Attorney General has delegated to ATF the authority to investigate, administer, and enforce the laws related to firearms, which, in relevant part, include the Gun Control Act of 1968, 18 U.S.C. Chapter 44 (GCA) and the National Firearms Act of 1968, 26 U.S.C. Chapter 53 (NFA). ATF's Firearms and Ammunition Technology Division (FATD) provides expert technical support on firearms and ammunition to federal, state, and local law enforcement agencies regarding the GCA and NFA.

7. 18 U.S.C. § 921(a)(24) provides "the term 'machinegun' has the meaning given such terms in section 5845(b) of the National Firearms Act (26 U.S.C. 5845(b))."

8.    26 U.S.C. § 5845(a)(6) defines, in relevant part, the term "firearm" to mean "a machinegun."

9.    26 U.S.C. § 5845(b) defines the term "machinegun" as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically, more than one shot, without manual reloading, by a single function of the trigger.  The term shall also include … any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun…."

10.    ·27 C.F.R. § 478.11 and 27 C.F.R. 479.11 similarly further define the term "machinegun", in relevant part, as follows:

> *Any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger.  The term shall include … any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun….  For purposes of this definition, the term "automatically" as it modifies "shoots, is designed to shoot, or can be readily restored to shoot" means functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger; and "single function of the trigger" means a single pull of the trigger and analogous motions…*

11.    26 U.S.C. § 5842(a) provides that "[e]ach manufacturer and importer and anyone making a firearm shall identify each firearm … manufactured, imported, or made by a serial number which may not be readily removed, obliterated, or altered…."

12.     Machineguns are very strictly regulated under federal law. With limited exceptions, 18 U.S.C. § 922(o) prohibits the manufacture, possession, transfer, and importation of machineguns manufactured after May 19, 1986. I know through my training and experience, post-1986 machineguns are generally non-transferable to the public, and can be manufactured only under very limited circumstances which would involve ultimate use for the military or law enforcement.

13.     Pursuant to 26 U.S.C. § 5841, NFA firearms, including machineguns, must also be registered in the National Firearms Registration and Transfer Record (NFRTR), which is administered by ATF. The registry is required to include the identification of the registered firearm, the date of registration, and the identification and address of the person entitled to possession of the registered firearm. The NFA also imposes a $200.00 making tax on each NFA firearm made, and additional $200 tax on each NFA firearm transferred (26 U.S.C. §§ 5811 and 5821).

14.     Based on my training and experience, I am aware that a semi-automatic firearm will fire only one round for each function of the trigger. After pulling the trigger, the shooter must release the trigger and then pull the trigger again to fire another round. This process of operation—pull and release—must be repeated each time the shooter wishes to fire the weapon. With an automatic firearm—a "machinegun" under federal law—the firearm will continue to fire with each function of the trigger (typically a pull), until the trigger is released, the ammunition supply is exhausted, or the firearm malfunctions.

## RBT and the FRT-15

15. RBT was incorporated in Florida in April of 2020 as a limited liability company. At the time, four individuals held ownership interest in RBT: (i) Lawrence DeMonico; (ii) Kevin Maxwell; (iii) Cole LeLeux; and (iv) Michael Register. DeMonico, LeLeux, and Register surrendered or divested their ownership interest by December 14, 2020. By November 2021, RBT re-incorporated as a North Dakota limited liability company. On December 7, 2021, RBT filed a form to change the address of its principal executive office to Fargo, North Dakota.

16. Lawrence DeMonico holds himself out to be the President of RBT.

17. Kevin Maxwell, an attorney, who has represented RBT in multiple matters, holds himself out to be the sole owner of RBT.

18. Maxwell, DeMonico, LeLeux, and Register maintain a substantial financial interest in RBT through a complex set of interlocking companies.

19. RBT is the maker and distributor of the FRT-15. The FRT-15 is a trigger assembly designed to be fitted into an AR-15 style firearm. It replaces the standard trigger assembly for such firearm.

 

20. The Wide Open Trigger (WOT) is also a trigger assembly designed to be fitted into an AR-15 style firearm. The WOT is a copy of the FRT-15.

 

21. On or about May 24, 2021, an ATF Special Agent acting in an Undercover (UC) capacity purchased a RBT FRT-15 from a website. Upon receipt, on or about June 2, 2021, the FRT-15 was retrieved by an ATF Special Agent and shipped to FATD for technical examination by a Firearms Enforcement Officer (FEO).

22. On or about July 15, 2021, an FEO issued a Report of Technical Examination in which the FEO observed that the FRT-15 is a drop-in fire control group manufactured by Rare Breed Triggers and which was not marked with a serial number. The FEO further observed that upon installing the FRT-15 into an ATF-owned AR style rifle, the rifle was test-fired with successively increasing rounds of ammunition loaded into the magazine. The FEO test-fired the firearm first with the magazine loaded with one round of ammunition, followed by a magazine loaded with two-rounds, then a magazine loaded with five rounds. Each method of test-fire was repeated one time. For the test-fires with multiple rounds (two rounds, and then five rounds), the AR-15 style rifle equipped with the FRT-15 expelled all rounds loaded in the magazine automatically with a single pull or function of the trigger. In other words, when the magazine

was loaded with two rounds, both rounds of ammunition were fired from the firearm when the trigger was pulled. When the magazine was loaded with five rounds of ammunition, all five rounds were fired from the firearm when the trigger was pulled.

23.    The FEO concluded that the examined FRT-15 is a combination of parts, designed and intended for use in converting a weapon (AR-15 style) into a machinegun, and is a "machinegun" under the GCA and NFA.

24.    On July 27, 2021, the Special Agent in Charge and Division Counsel of the ATF Tampa Field Division met with Kevin Maxwell at an ATF office in Orlando, Florida, for the purpose of serving on RBT a cease-and-desist letter informing RBT that ATF had examined the FRT-15 and determined it to be a machinegun. The letter further informed RBT that because the FRT-15 is a machinegun, RBT must cease and desist the manufacturing and transfer of the FRT-15 and, within five days of receipt of the letter, develop a plan for addressing the machineguns already distributed.

25.    The letter informed RBT of the potential civil and criminal penalties, which included, if they failed to cease and desist, possible referral to the United States Attorney's Office for criminal prosecution; tax assessment and collection; and/or seizure and forfeiture of firearms and property involved in violations of federal law.

26.    Maxwell stated that he was not surprised by the ATF determination and added that he believed that ATF would have tried to stop RBT from selling the FRT sooner than it had. Maxwell stated that RBT would not comply with the cease-and-desist letter, and that it already had drafted pleadings to file.

27.    On August 2, 2021, RBT and Kevin Maxwell filed a civil lawsuit against the Attorney General and various ATF officials in their official capacities, in the Middle District of Florida

(*Rare Breed Triggers, LLC et al., v. Garland, et al.,* 6:21-cv-01245), seeking declaratory and injunctive relief. On August 5, 2021, United States District Judge Carlos E. Mendoza denied RBT and Maxwell's motion for a Temporary Restraining Order. On October 21, 2021, Judge Mendoza denied RBT and Maxwell's Motion for a Preliminary Injunction. On October 28, 2021, Judge Mendoza *sua sponte* dismissed the matter without prejudice.

28.     On November 15, 2021, ATF issued another letter to Maxwell and RBT reinforcing ATF's determination that the FRT-15 is a "machinegun" under federal law in that it allows a firearm to expel more than one shot, without manual reloading, with a single, continuous pull of the trigger. The letter again warned RBT of the possible penalties associated with non-compliance.

## RBT Lawsuit for Patent Infringement

29.     On or about March 8, 2022, RBT, and an associated entity, ABC IP, LLC, filed a complaint in the Northern District of Florida for patent infringement against the manufacture of the WOT and other (*Rare Breed Triggers, LLC et al., v. Big Daddy Enterprises, Inc., et al.,* 1:22-cv-00061). On October 19, 2022, the District Court entered a consent judgement and permanent injunction in favor of RBT. Upon information and belief, as part of an agreement between the parties, RBT acquired the remaining stock of WOTs.

30.     By this point, ATF had also examined the WOT. On or about October 20, 2021, an FEO assigned to ATF's FATD issued a Report of Technical Examination in which the FEO determined that, like the FRT-15, the WOT was a "machinegun" under federal law. The examined WOT also lacked a required serial number.

## District of Utah Federal Search Warrant and DeMonico Interdiction

31.     At no time did RBT comply with the cease-and-desist letter or heed any ATF warnings regarding the FRT-15. RBT continued to sell and distribute the FRT-15. The ATF investigation revealed that the FRT-15s, though being sold by RBT with shipping labels indicating their origin in Florida, were actually being shipped by a company called 3rd Gen Machine, Inc., (3rd Gen) in Logan, Utah. It was subsequently determined that 3rd Gen was the contract manufacturer of the FRT-15 and was also shipping orders on behalf of RBT directly from 3rd Gen's premises via common carrier.

32.     On January 13, 2022, an ATF Assistant Special Agent in Charge and Resident Agent in Charge of the ATF's Salt Lake City Field Office, Denver Field Division, served a cease-and-desist letter on 3rd Gen regarding the FRT-15. The 3rd Gen cease-and-desist contained the same information and warnings as was contained in the cease-and-desist letter served on RBT and Maxwell.

33.     3rd Gen ignored the cease-and-desist letter and continued to manufacture and ship the FRT-15 on behalf of RBT.

34.     On March 26, 2022, ATF executed a federal search warrant issued in the District of Utah, at the premises of 3rd Gen Machine, Inc., (3rd Gen), seizing FRT-15s components and other evidence. After the warrant was executed, RBT, through Lawrence DeMonico, made public statements on social media regarding RBT's supplier being "raided" by ATF.

35.     On or about April 13, 2022, ATF learned through the United States Attorney's Office in Utah, that counsel for 3rd Gen communicated to the United States Attorney's Office that there remained FRT-15s that were not located and seized by ATF during the execution of the search warrant on March 26, 2022, and which 3rd Gen wished to turn over to ATF. On April 14, 2022,

an ATF Special Agent contacted 3rd Gen's counsel regarding the FRT-15s. 3rd Gen's Counsel advised that the FRT-15s were on a small pallet in the parking lot. Later that same day, counsel for 3rd Gen again contacted ATF and informed ATF that an individual associated with RBT was at 3rd Gen's location and was taking the FRT-15s. This person was subsequently identified as Lawrence DeMonico.

36. DeMonico told the General Manager of 3rd Gen, "I'm here to take my shit [FRT-15s]". The General Manager told him not to take the items and advised him that ATF was coming to take them. DeMonico responded, "I don't care." DeMonico proceeded to load boxes that contained FRT-15s and component parts—the same products 3rd Gen had set aside for ATF— into a U-Haul van, and drove off.

37. DeMonico was interdicted by ATF Special Agents in New Mexico on April 15, 2022. During the interdiction, ATF seized nearly 1,000 FRT-15s, and over 15,000 parts and components meant to assemble an FRT-15.

38. On or about February 14, 2023, the United States Attorney's Office for the District of Utah filed a verified complaint for forfeiture *in rem* with respect to the FRT-15s and component parts seized from DeMonico as a result of the April 15, 2022, interdiction, as well as from the March 26, 2022 search warrant at 3rd Gen (*United States of America v. Miscellaneous Firearms and Related Parts and Equipment Listed in Exhibit A*, 1:23-cv-00017). RBT and Maxwell have filed a claim for the return of the seized items, and the matter is ongoing.

## ATF Open Letter

39. On or about March 22, 2022, ATF issued a document entitled "Open Letter to All Federal Firearms Licensees", available at https://www.atf.gov/firearms/docs/open-letter/all-ffls-mar-2022-open-letter-forced-reset-triggers-frts/download. The Open Letter informed the general

public that certain "forced reset triggers" allow a firearm to automatically expel more than one shot by a single, continuous pull of the trigger, and are therefore "machineguns" under federal law. The FRT-15 and WOT, though not specifically identified in the letter due to restrictions imposed by 26 U.S.C. § 6103, are such devices.

## District of North Dakota Lawsuit

40.     On May 16, 2022, RBT again sued ATF, this time in the District of North Dakota (*Rare Breed Triggers, LLC, v. Garland et al.,* 3:22-cv-00085). On November 4, 2022, United States Magistrate Judge Alice R. Senechal dismissed the complaint without prejudice for lack of venue.

## RBT Sells WOTs

41.     In November 2022, withing weeks of their North Dakota lawsuit being dismissed, RBT began selling WOTs to consumers throughout the United States via the United States Postal Service (USPS).

42.     In a mass marketing email sent on November 22, 2022, RBT stated that "As crazy as it might sound, we have WOTs for sale. And you assuredly have questions but unfortunately, we can't really answer them. We can't tell you where these came from and ... we can't tell you why we can't tell you but rest assured, these are real WOTs. Notwithstanding the cloak and dagger, these WOTs are the property of RBT and they are available now at a ridiculously huge discount."

43.     On November 28, 2022, RBT began shipping WOTs. According to records obtained from USPS, between November 28, 2022, and January 16, 2023, RBT shipped packages presumptively containing WOTs to an estimated 2,409 unique purchasers. At least 22 such shipments were to individuals located in North Dakota. It is not known how many WOTs were distributed by RBT, but based on package weight, it is estimated that at least some recipients

received multiple WOTs in a single shipment. Further, some recipients received multiple WOTs across two or more shipments.

44.      According to USPS records, the shipping account used to mail the WOTs was opened on November 22, 2022, and is registered to Lawrence DeMonico under the company name Rare Breed Triggers. The billing address is listed at 3523 45th Street South, Suite 100, Fargo, North Dakota, 58104. The registrant's physical address and mailing address are listed as 3523 45th St S., Fargo, North Dakota, 58104.

45.      On or about November 23, 2022, ATF Special Agents in the New York Field Division began directing the UC purchase of WOTs from RBT by UC personnel across several field divisions. These purchases were made through RBT's website www.rarebreedtriggers.com.

46.      Between November 23, 2022, and November 29, 2022, ATF Special Agents purchased 31 WOTs from RBT. The packaging for these shipments universally identified the return address as "Red Beard Treasures, 3523 45th Street South, Suite 100, Fargo ND 58104. Further, the packing slips accompanying the shipments identified the seller as Rare Breed Triggers, 3523 45th Street South, Suite 100, Fargo, ND 58104. ATF UCs were able to purchase multiple WOTs.



According to USPS, based upon a review of some tracking numbers associated with the UC purchases, RBT shipments originated from North Dakota and Texas.

47.    These 31 WOTs were sent to ATF's FATD for examination.  On January 13, 2023, an ATF FEO issued a Report of Technical Examination, in which the FEO confirmed the WOTs functioned in the same manner as previously examined WOTs and FRT-15s.  Based upon the FEO's examination and testing of a representative sample of the WOTs, the FEO concluded that the WOTs are "machineguns" under federal law in that each WOT is a combination of parts designed and intended for use in converting a weapon into a machinegun, and through demonstration, each successfully converted a semi-automatic rifle into a machinegun.

### Eastern District of New York Lawsuit

48.    On January 19, 2023, the United States Attorney's Office for the Eastern District of New York filed a complaint against RBT, DeMonico, Maxwell, and an associated entity, Rare Breed Firearms, pursuant to 18 U.S.C. § 1345 seeking injunctive relief (*United States of America v. Rare Breed Triggers et al.,* 1:23-cv-00369).  On January 25, 2023, United States District Judge Nina R. Morrison issued a TRO against the Defendants.  The TRO remains in effect and the litigation is ongoing.  A hearing on the government's motion for a preliminary injunction was held August 1 and 2, 2023, and the court has not ruled on the motion.

49.    On July 7, 2023, DeMonico was deposed by the government in connection with the lawsuit filed in EDNY.  DeMonico was represented by counsel.  Kevin Maxwell participated by teleconference.

50.    DeMonico was asked about existing inventory of WOT, to which he responded:

> Okay.  Glad that was your next question, because I was going to make sure you didn't move on.  Yes, we still have quite a bit of WOTs.

I find it very interesting that, throughout all of this, the ATF has never actually showed up to my office in Fargo, North Dakota, because I have a ton of them sitting in my office in Fargo, North Dakota.

And if the end of this depo results in a phone call to the ATF, I just ask that they ask to be let in the door and not, you know, knock it off its hinges.

But other than that, we also have inventory in storage units.

51.    When pressed to the quantity of WOTs at RBT's office in Fargo, ND, DeMonico estimated that there were five or six boxes each containing approximately 100 WOTs. DeMonico also confirmed that the WOTs were shipped to RBT by "Big Daddy Unlimited"—who RBT has sued for patent infringement in the Northern District of Florida—and that they were shipped to RBT by common carrier. DeMonico stated that RBT received the WOTs as part of the settlement agreement between the parties.

52.    The Assistant United States Attorney (AUSA) asked when RBT received "these five or six boxes" to which, DeMonico responded:

Okay. I want to back up to be very, very clear. I feel like there's been a little bit of a misunderstanding. There's a lot more than five boxes – five, six boxes.

There's five or six boxes in my office in Fargo. There are many, many, many – many more boxes in storage units.

53.    DeMonico was asked how many WOTs are in each storage unit. He responded, "I can't even begin to guess, but it's a lot."

54.    When asked where the storage units are located, DeMonico responded, "There is one storage unit in Fargo, North Dakota. And there is one storage unit in the outskirts of Dallas,

Texas. The AUSA inquired about the address of the storage units, to which DeMonico responded that he did not have the address.

55.    DeMonico was asked if he would be willing to turn the WOTs over to ATF. DeMonico responded, "I prefer not to", and that "I still plan on winning the case." DeMonico was then asked if he would provide the addresses for the storage units, and he responded, "I prefer not to. I still plan to win this case."

56.    On July 10 and July 11, the United States Attorney's Office in the Eastern District of New York inquired with counsel for RBT, DeMonico, and Maxwell whether RBT would agree to turn over the WOTs possessed in Fargo, ND, and Dallas, TX, to ATF. The United States Attorney's Office represented that such as a surrender would not be a waiver of any rights and that RBT would have the ability to file a claim for the return of the WOTs in accordance with applicable federal forfeiture law. This is a process to which RBT is familiar as they are currently contesting the forfeiture of FRT-15s in the District of Utah. Counsel for RBT has, to this date, not responded.

## Licensing and Registration

57.    RBT is not licensed by ATF as a Federal Firearms License (FFL) holder under the GCA. It is not authorized under Federal law to manufacture, import, or deal in firearms. RBT is not a Special Occupation Taxpayer (SOT) under the NFA and is not licensed under the NFA. It is not authorized under Federal law to manufacture, import, or deal in NFA firearms, including machineguns. There is no record of RBT submitting to ATF an application to make, receive, or transfer an FRT-15 or WOT, nor is there a record for approval of any such activity.

58.    RBT does not have any FRT-15s or WOTs registered to it in the NFRTR. As post-1986 machineguns, it would not be permissible for RBT, Lawrence DeMonico, or Kevin Maxwell to

register in their names an FRT-15 or WOT, except for certain exceptions not applicable here. Further, because there do not appear to be any FRT-15s or WOTs marked with required serial numbers, such FRT-15s and WOTs cannot be registered in the NFRTR.

### Premises to be Searched

59.    On August 2, 2023, I conducted a business search on the website maintained by the North Dakota Secretary of State (SOS) (https://firststop.sos.nd.gov/search/business) for "Rare Breed Triggers". The search yielded one result for "Rare Breed Triggers, LLC" with SOS control ID # 005688394. According to information maintained by the SOS, RBT is a limited liability company in good standing in North Dakota with a principal address of 3523 45th Street, Suite 100, Fargo, ND 58104. This is the same address identified in the records provided by USPS and which appeared on the return shipping labels for the WOTs purchased by the ATF UCs.

60.    Kevin Maxwell is also identified within the SOS records under both the principal address and mailing address for RBT. Upon information and belief, when Lawrence DeMonico stated in the deposition that he had WOTs at his office in Fargo, North Dakota, he was referring to 3523 45th Street South, Suite 100, Fargo, ND 58104.

61.    On July 24, 2023, an ATF Special Agent visited 3523 45th Street South, Suite 100, Fargo, ND 58104. Upon information and belief, the location is a shared office space where individuals and entities can rent individual offices and utilize common meeting rooms and receptionist support. Suite 100 refers to the entire facility in which there appears to be approximately 97 individual offices.

62.    On August 2, 2023, ATF Special Agents visited 3523 45th Street South, Suite 100, Fargo, ND 58104 and spoke to a male located at the receptionist desk. The male receptionist informed Special Agents that Rare Breed Triggers occupies Unit 186. The male receptionist stated that the

employees of the business were not currently on the premises and that "they" only come to town for planned business.

## Authorization Request

63.    Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 922(o), and 26 U.S.C. §§ 5861(d) and 5861(e) have been committed by RBT, Lawrence DeMonico, and Kevin Maxwell.  Further, there is probable cause to believe that property that constitutes evidence of such violations is located at 3523 45th Street South, Suite 100, Unit 186 Fargo ND 58104 (PREMISES), including approximately 500 to 600 WOTs.

64.    Based on my experience and training, business premises will be used to house and store electronic equipment, such as computers, and store documents and records related to business activities.  Because the PREMISES have been identified as the return address for RBT's shipments of WOTs, and because DeMonico volunteered that WOTs remain at the PREMISES, there is probable cause to believe that documents and records are present at the PREMISES related to the receipt, sale, shipment, distribution, and storage of WOTs.

## Computers, Electronic Storage, Cellular Telephones and Forensic Analysis

65.    As described above and in Attachment B, this application seeks permission to search for records at the PREMISES, in whatever form they are found.  One usual form in which the records would be found in any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Federal Rule of Criminal Procedure 41(e)(2)(B).

66.    I submit that if a computer or storage medium is found at the PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.    Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.    Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space — that is, in space on the storage medium that is not currently being used by an active file — for extended periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.    Wholly apart from user-generated files, computer storage media — in particular, computers' internal hard drives — contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence,

because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache.

67. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a business.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is

evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

68.    Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection to determine whether it is evidence described by the warrant.

69.    It is possible that the PREMISES will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well. Typically, law enforcement will perform an onsite preview of all electronic devices owned by, used by, or accessible to the suspect. If, in this case, law enforcement can preview and determine that the electronic devices (1) are not owned by, used by, or accessible to the suspect, or (2) do not contain fruits and/or evidence of the violations listed, the electronic devices will be returned to their rightful owner.

## Conclusion

70.    Based on the information set forth in this affidavit, I respectfully submit that there is

probable cause to believe that the PREMISES and computer or storage media therein contain

fruits, evidence, and instrumentalities of violations of the GCA, specifically 18 U.S.C. § 922(o),

and the NFA, specifically 26 U.S.C. §§ 5861(d) and 5861(e), as described in "Attachment B".

Christine Gass
Special Agent
Bureau of Alcohol, Tobacco,
    Firearms and Explosives

Sworn to before me and signed in my presence this _3rd_ day of August, 2023.

Alice R. Senechal
United States Magistrate Judge